**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WILLIAM JOSEPH WEBB, JR.,    )
                                 )
          Plaintiff,         )
                                 )
          v.                 )      C. A. No. 07-31-GMS
                                 )
FIRST CORRECTIONAL MEDICAL,   )      JURY TRIAL REQUESTED
et al.,                           )
                                 )
          Defendants.      )

**DEFENDANT GOVERNOR RUTH ANN MINNER'S
MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF HER MOTION TO DISMISS THE COMPLAINT</u>**

## BACKGROUND

The Complaint in this *pro se* prisoner civil rights action was filed on January 16, 2007 against various State and medical defendants. [D.I. 2]. Pursuant to this Court's order dated May 7, 2007, certain claims and defendants were dismissed from the action without prejudice. [D.I. 9].

On July 9, 2007, an Answer to the Complaint was filed on behalf of Defendant Governor Ruth Ann Minner ("Governor Minner"). [D.I. 24]. Governor Minner has moved to dismiss the complaint. This is Governor Minner's Memorandum and Points of Authorities in support of her Motion to Dismiss.

## <u>FACTS</u>

During the time period relevant to this cause of action, Plaintiff William Joseph Webb, Jr. ("Plaintiff") was an inmate incarcerated at Delaware Correctional Center ("DCC") in Smyrna, Delaware. His claims concern the medical care he received at DCC.

Governor Minner is mentioned just twice in the Complaint.

First, Plaintiff alleges that on March 11, 2005, Dr. Ali ordered ultrasound testing of Plaintiff's legs. D.I. 2 at ¶ 1. According to Plaintiff, Dr. Ali then denied the request for the ultrasound testing, and the procedure was not performed at that time. Plaintiff claims that the test was not performed in order to save money for Defendant First Correctional Medical. *Id.*

Plaintiff next states that "In the approximity [sic] of November or December, 2005, Plaintiff had His Sister go the Hearings held in Dover where . . .Governor Ruth Ann Minner became officially aware that Plaintiff was being denied medical care to save money." Plaintiff does not specify what hearing he is referencing and does not explain how Governor Minner became aware that he "was being denied medical care to save money." Plaintiff does indicate that, shortly after the hearings, he received the requested testing. *Id.*

In his second reference to Governor Minner, Plaintiff asserts: "After numerous newspaper articles about the serious denial of medical care at State of Delaware's Correctional Institutions where Plaintiff is housed, Defendants First Correctional Medical, Correctional Medical Services, Governor Ruth Ann Minner, and Commissioner Stanley Taylor were negligent in their obligations to Plaintiff to make sure that Plaintiff is receiving adequate medical care after they were aware that Plaintiff was not receiving medical care that Hee [sic] needed and still needs without deliberate indifference until He is released from prison/while under their care." D.I. 2 at ¶3. Again, Plaintiff does not explain the factual basis of his allegation that Governor Minner knew that he was not receiving medical care.

Plaintiff asserts that the alleged denial of medical care constituted cruel and unusual punishment by all of the Defendants. He seeks compensatory and punitive damages and injunctive relief.

## ARGUMENT

### I.   STANDARD FOR MOTION TO DISMISS.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may, upon a party's motion, dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a Rule 12(b)(6) motion, the court must accept as true all factual allegations contained in the complaint as well as all reasonable inferences that may be drawn from those allegations and view them in the light most favorable to the nonmoving party. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.*

For the reasons stated herein, Governor Minner is entitled to dismissal of the Complaint with prejudice because Plaintiff has failed to state a claim upon which relief can be granted.

## II.    GOVERNOR MINNER WAS NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS.

Plaintiff is arguing that the Governor of the State of Delaware should have taken some action with respect to his medical treatment in prison.  However, neither the allegations in the Complaint nor the case law support this claim.

To state a violation of the Eighth Amendment right to adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A defendant is deliberately indifferent only where he or she has the required mental state. *Williams v. First Correctional Medical*, 377 F. Supp. 2d 473, 476 (D. Del. 2005).  That is, a defendant can be held liable only where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff is, in effect, arguing that Governor Minner knew that he was not receiving medical care, but failed to act to remedy the situation.  However, he does not explain exactly what Governor Minner knew or how she came to acquire the information. He mentions hearings in Dover, but he does not specify a date.  He does not allege that Governor Minner was present during the hearing in question.  He does not claim that any information about his circumstances was presented at the hearing.

Plaintiff also references newspaper articles about medical care at Delaware correctional facilities.  However, he does not claim that he was specifically mentioned in any of the articles.

In short, Plaintiff's Complaint fails to offer any factual support for his allegation that Governor Minner knew about his circumstances. Thus, Plaintiff cannot meet the threshold requirement for the deliberate indifference standard: he cannot show that Governor Minner knew of and disregarded "an excessive risk to [his] health or safety."

Plaintiff has failed to state an Eighth Amendment claim of deliberate indifference against Governor Minner, and his Complaint must be dismissed.

## III.    GOVERNOR MINNER HAD NO PERSONAL INVOLVEMENT IN THE ALLEGED CONSTITUTIONAL VIOLATIONS.

Plaintiff cannot state a claim against Governor Minner simply by suggesting that, because she is the Governor of the State of Delaware, she had responsibility for the medical care provided to him.

The Third Circuit has held that a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). *See also Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Personal involvement can be shown through assertions of personal direction, or actual knowledge and acquiescence. *Rode*, 845 F.2d at 1207. "A plaintiff must allege personal involvement with particularity, stating the conduct, time, place, and persons responsible for the alleged civil rights violations." *Joynes v. Meconi,* 2006 WL 2819762, at *9 (D. Del. Sept. 30, 2006) (attached hereto as Exhibit A). *See also Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005).

In this case, it is clear that the Governor of the State of Delaware does not personally direct the provision of medical care to inmates. Further, Plaintiff has failed to allege knowledge and acquiescence with particularity. As noted herein, Plaintiff has not

even explained how Governor Minner knew that he was not, as he alleges, receiving adequate medical care.

Further, Plaintiff has failed to allege the necessary personal knowledge to sustain his claim against Governor Minner.

In *Rode,* 845 F.2d 1195, plaintiff, a civilian employee of the Pennsylvania State Police, claimed that she had been subjected to retaliation arising out of racial animus. She named Pennsylvania's governor as a defendant. She alleged that the governor had personal knowledge of her harassment as the result of grievances she filed with his office. *Id.* at 1208. The Third Circuit rejected plaintiff's argument, stating that the allegations were insufficient to show that the governor had actual knowledge of the alleged constitutional violations. The Court stated that a contrary holding would subject a governor to potential liability in any case where the plaintiff merely transmitted a complaint to the governor's office. *Id. See also Crosby v. Georgakopoulos,* 2005 WL 1514209, at *9 (D.N.J. June 24, 2005) (attached hereto as Exhibit B) (immigration detainee's claim that the District Director of Bureau of Immigration and Customs Enforcement's failure to respond to his letters was insufficient to show that the Director had actual knowledge of plaintiff's complaints).

In this case, the allegations are insufficient to show that Governor Minner had actual knowledge of Plaintiff's medical status. Plaintiff references only a public hearing and newspaper articles. As a policy matter, Governor Minner should not be subjected to liability every time an issue is presented in a public forum. As the United States Supreme Court has stated, permitting "insubstantial lawsuits" against high government officials to proceed to trial would "undermine the effectiveness of government." *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 819 n. 35 (1982).

Thus, in the absence of Governor Minner's personal knowledge of or involvement in the alleged constitutional violations, Plaintiff has failed to state a claim upon which relief can be granted, and the Complaint must be dismissed.

## IV.    UNDER THE ELEVENTH AMENDMENT, GOVERNOR MINNER CANNOT BE HELD LIABLE IN HER OFFICIAL CAPACITY.

"[I]n the absence of consent, a suit [in federal court] in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This preclusion extends to state officials when "the state is the real, substantial party in interest." *Id.* at 101 (*quoting Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). "Relief sought nominally against an [official] is in fact against the sovereign if the decree would operate against the latter." *Id.* (*quoting Hawaii v. Gordon*, 373 U.S. 57, 58 (1963)). A State may waive its Eleventh Amendment immunity. However, such waiver must constitute an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Ospina v. Dep't of Corrections*, 749 F. Supp. 572, 578 (D. Del. 1990) (*quoting Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n. 1 (1985)).

In this case, the State of Delaware has neither consented to Plaintiff's suit nor waived its immunity. Therefore, under the Eleventh Amendment, Governor Minner cannot be held liable in her official capacity.

WHEREFORE, for the reasons set forth herein, Defendant Governor Ruth Ann Minner respectfully requests that this Court grant her Motion to Dismiss.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


/s/ Eileen Kelly
Eileen Kelly (#2884)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
eileen.kelly@state.de.us
(302) 577-8400
Attorney for Defendant
Governor Ruth Ann Minner

DATE: August 23, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2007, I electronically filed *Defendant Governor Ruth Ann Minner's Memorandum of Points And Authorities In Support of Her Motion to Dismiss* with the Clerk of Court using CM/ECF, which will send notification to Megan T. Mantzavinos, Esquire and Patrick G. Rock, Esquire. I hereby certify that on August 23, 2007, I have mailed by United States Postal Service, the document to the following non-registered party: William Joseph Webb, Jr.

/s/ Eileen Kelly
Deputy Attorney General
Department of Justice
820 N. French St., 6th Floor
Wilmington, DE 19801
(302) 577-8400
eileen.kelly@state.de.us

# EXHIBIT A



Slip Copy                                                                                         Page 1

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

Joynes v. Meconi
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Timothy N. JOYNES, Plaintiff,
v.
Vincent P. MECONI, et al., Defendants.
**Civil Action No. 05-332 GMS.**

Sept. 30, 2006.

Timothy N. Joynes, Newark, DE, pro se.
W. Michael Tupman, Department of Justice, Dover, DE, for State of Delaware.
Christine K. Demsey, Demsey, Seubert & Sale, Wilmington, DE, pro se.
Denise Lewis, pro se.

### *MEMORANDUM*
GREGORY M. SLEET, District Judge.

#### I. INTRODUCTION

*1 On May 26, 2005, the plaintiff, Timothy N. Joynes ("Joynes"), filed this *pro se* civil rights action against twenty-three individual defendants, as well as the Family Court for the State of Delaware (the "Family Court"), the Delaware Department of Health and Social Services (the " DHSS"), the Delaware Division of Child Support Enforcement (the "DCSE"), the State of Delaware Department of Justice (the "Delaware DOJ"), the State of Delaware Judiciary (the "Delaware Judiciary"), the State of Delaware (the "State") (collectively, the "State Agency Defendants"), and the Delaware Support Formula Ad Hoc Committee (the "Ad Hoc Committee").[FN1] Joynes' complaint alleges violations of his constitutional rights under the following statutes: 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 241, 18 U.S.C. § 1503, 18 U.S.C. §

1512(b), (c), (d), 18 U.S.C. 1581, 18 U.S.C. § 1584 , and 18 U.S.C. § 1589. Joynes complaint contains state law claims for intentional infliction of emotional distress and negligent infliction of emotional distress. Presently before the court are two motions: (1) Demsey and Lewis' Motion to Dismiss for Failure to State a Claim (D.I.7), and (2) the state defendants' motion to dismiss (D.I.8). For the reasons that follow, the court will grant both motions.

> FN1. The twenty-three individual defendants named in Joynes' complaint are: Vincent P. Meconi, Secretary of the DHSS; Charles E. Hayward, Director of the DCSE; the Honorable Martha Sackovich, Family Court Commissioner; the Honorable Mary Ann Herlihy, Family Court Commissioner; the Honorable Jay H. Conner, Family Court Judge; Christopher Spizzirri, Deputy Attorney General for the Delaware DOJ; Stephanie Fitzgerald, Family Court Mediator; Ruth Ann Minner, Governor of Delaware; Denise Lewis, Joynes' wife; Christine K. Demsey, the attorney representing Lewis in the child support proceedings; and thirteen individual Ad Hoc Committee members, including the Honorable Vincent J. Poppiti, then Chief Judge of the Family Court; the Honorable Patricia Blevins and the Honorable Robert J. Valihura, Jr., then Family Court Judges; Peter S. Feliceangeli, Esq.; Andrew Haman; then Commissioner Joelle Hitch; Commissioner Andrew T. Horsey; Janine Howard, Esq.; Alisa Mawson; Ellen Meyer, Esq.; Commissioner Andrew K. Southmayd; Mona Steele; and Barbara E. Corrozi (collectively, the "individual Ad Hoc Committee members").

#### II. BACKGROUND

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

The following facts are taken from the plaintiff's complaint. The incidents complained of in Joynes' complaint arise from child support proceedings taking place in the Family Court between October 2003 and January 2005. Joynes alleges that, on October 16, 2003, his wife, Denise Lewis ("Lewis") sought the services of the DCSE and filed a child support petition, in order to pay for her expenses and the expenses of their child, who was living with Lewis at the time.[FN2] (D.I. 2 ¶¶ 59-63.) On December 22, 2003, Joynes received a summons, advising him of the date and time of his court mediation/hearing on the petition, January 15, 2004, and informing him of sanctions that would be imposed against him if he did not appear at the mediation/hearing. (Id. ¶ 66.) Joynes claims that the summons did not indicate that he had a right to contest the child support action, as required by Title IV-D of the Social Security Act. (Id. ¶¶ 67-68.) It also appears from the face of the complaint that Joynes alleges the summons violated his Fourteenth Amendment right to due process. (Id. ¶ 75.)

> FN2. According to the complaint, Joynes and Lewis were married on February 6, 1998. (D.I. 2 ¶ 50.) Subsequent to their marriage, Lewis gave birth to two boys. (Id. ¶ 51.) On August 21, 2001, Joynes and Lewis experienced marital problems and decided to separate. (Id. ¶ 52.) As of the filing date of this action, Joynes and Lewis allegedly were still married and no longer separated. (Id. ¶ 25.)

On January 15, 2004, Joynes appeared at the mediation/hearing in the Family Court. (Id. ¶ 76.) "[I]n a rush to arrive to Family Court on time, [Joynes] left his documentation [such as receipts and cancelled checks] needed for the court at home." (Id. ¶ 77.) After arriving at the mediation, Stephanie Fitzgerald ("Fitzgerald"), the mediator, requested the parties to produce their paperwork. (Id.¶ 78.) Joynes explained that he had left his paperwork at home and Fitzgerald responded by stating that she had a copy of his 2003 income statement. (Id.) The income statement indicated that Joynes had an income of $61,000 for the tax year, a true number, but one which included $20,000 in

overtime that is normally not guaranteed to Joynes. (Id.) Joynes explained this fact to Fitzgerald, but she drafted an interim child support order based on the non-guaranteed overtime, based on Lewis working a forty-hour week with no overtime, and "without producing evidence that [Joynes] failed to support a child conceived." (Id.) After drafting the order, Fitzgerald "sign[ed] to have [Joynes'] pay attached" without proof of non-support. (Id. ¶ 79.) Joynes alleges that Fitzgerald's actions violated his civil rights by denying him equal protection of the law and "initiat[ing] the first step toward making [him] a peon to the State of Delaware." (Id. ¶¶ 79, 80, 85.)

**\*2** Joynes requested to have his case heard in Family Court in front of a commissioner. (Id. ¶ 80.) His request was granted and, on April 12, 2004, Joynes had his case heard by Commissioner Martha Sackovich ("Commissioner Sackovich"). (Id. ¶ 90.) Christopher Spizzirri ("Spizzirri"), a Deputy Attorney General for the State, prosecuted the case for Lewis and the DCSE, and requested Commissioner Sackovich to award Lewis child support. (D.I. 2 ¶ 92-93.) Commissioner Sackovich acceded to Spizzirri's request and entered a child support order. (See id. ¶ 96.) Joynes claims that Spizzirri prosecuted the case even though he had no knowledge of the facts at hand, thereby violating his rights. (Id.¶ 92.) Joynes further alleges that Commissioner Sackovich violated his rights by finding him liable for child support, without indicating what finding of law made him liable to Lewis and contrary to the evidence of support that he presented. (Id.¶¶ 94, 96.) Joynes alleges that when he received his permanent support order, Commissioner Sackovich had raised his annual salary to almost double his base salary, in violation of his rights. (Id.¶ 99.) According to Joynes, the Family Court "regularly convicts non-custodial parents for non-support because they classify custodial and non-custodial parents differently, with no legitimate state purpose. " (Id.¶ 101.) Joynes alleges that this "convict[ion]" is a source of injury to him, giving rise to claims against Spizzirri and Commissioner Sackovich. (Id.)

On July 9, 2004, Joynes made a phone call to Charles Hayward, Director of the DCSE, but was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

directed to a representative of the agency. (*Id.*¶ 105.) Dissatisfied with the responses to his questions and wanting to speak with Hayward directly, Joynes sent two letters to Hayward, on July 10, 2004 and July 12, 2004, respectively. (*Id.*¶ 108, 110.) The July 10, 2004 letter addressed miscalculations in Joynes' support arrearage and also stated that the DCSE "was circumventing their responsibility of investigating the facts on a child support petition before forwarding it to the Delaware [DOJ]." (*Id.*¶ 110.) The July 12, 2004 letter again addressed the DCSE's responsibility for investigating child support petitions, specifically its "failure to discover relevant information to discredit Lewis' claim that [Joynes] failed to support his children...." (*Id.*¶ 111.) Joynes sent letters similar to the July 12, 2004 letter to Vincent P. Meconi (" Meconi"), Director of the DHSS and Governor Ruth Ann Minner ("Governor Minner"). (*Id.*¶¶ 114, 116.) Hayward and Meconi responded to the letters but, according to Joynes, Governor Minner " left it up to Hayward and Meconi to settle [Joynes'] questions. (*Id.* ¶ 116.)

Hayward's letter, dated July 27, 2004, discusses the procedures used by the DCSE to verify an agency application in order to prepare a support petition. ( *Id.* ¶ 113.) Meconi's letter "attempt[s] to better clarify the process" of initiating a case for child support enforcement. (*Id.* ¶ 116.) The letter explains that the DCSE files a petition for child support much like an individual "walks into the court and files a petition on his or her own." (*Id.*) After the petition is filed, the court schedules a hearing and notices the parties. (*Id.*) According to the letter, "[t]he hearing is the fact-finding venue, where the court gathers the evidence presented by the parties," and then enters an order based on the evidence presented. (*Id.*) The individual's right to due process "comes during the court hearing." (*Id.*) Finally, the letter states that the paragraphs of the petition are "merely ... allegation[s]," and "not meant to be a negative or discriminatory remark toward the respondent." (*Id.*) Joynes claims that the DCSE does not follow its own procedures, as set forth in the handbook on child support enforcement and, as a result, Meconi, Hayward, and Governor Minner violated his rights, and were a direct source of injury supporting his causes of action. (*Id.* ¶¶ 118-19.)

*3 In August 2004, Joynes submitted two petitions to the family court: (1) a petition for modification of child support, and (2) a Rule to Show Cause petition. (D.I. 2 ¶ 120.) Joynes' Rule to Show Cause petition was forwarded to Commissioner Mary Ann Herlihy ("Commissioner Herlihy"), who set a court hearing on the petition for January 4, 2005. (*Id.*¶ 121.) However, on October 25, 2004, Commissioner Herlihy dismissed the claim for failure to state a cause of action "without giving [Joynes] an opportunity to appear ." (*Id.*¶ 121-22.) Joynes appealed the ruling and, on November 17, 2004, had his appeal heard by the Honorable Jay H. Conner ("Judge Conner"). (*Id.*¶ 123.) Judge Conner dismissed the appeal for failure to state a claim, "[d]espite the fact that [Joynes] was entitled to have his case heard by the Family Court." (*Id.*) At this point, Joynes "ceased seeking justice through the Family Court." (*Id.*) Joynes alleges that the actions of Commissioner Herlihy and Judge Conner deprived him of substantive due process and denied him equal protection of the laws. (*Id.*)

On January 11, 2005, Joynes and Lewis appeared in the Family Court for a mediation/hearing concerning Joynes' petition for modification of the child support payment. (*Id.*¶ 125.) Lewis was represented in the action by Christine K. Demsey (" Demsey"), a family law attorney. (*Id.*) The mediator requested pay stubs from the parties and compiled four child support orders; two based on a forty-hour work week and two based on a year-to-date income. (*Id.*¶¶ 125-26.) Joynes requested that the mediator use the child support order based on a forty-hour work week. (*Id.*¶ 126.) Lewis and Demsey disagreed, and asked the mediator to use the support order that included overtime. (*Id.*¶ 127.) It is not clear from the face of the complaint which order the mediator entered. However, Joynes promised to take further legal action against Lewis and Demsey, outside of the Family Court. (*Id.*¶¶ 129-30.) In this action, Joynes claims that Lewis and Demsey violated his rights by using the Family Court, the Delaware Judiciary, and the Delaware DOJ to deny his constitutional rights. (*Id.*¶ 135.) Joynes also claims that Lewis and Demsey caused him to suffer a serious financial setback-he fell

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

behind on rent, had his utilities turned off, and fell behind with his car payments. (*Id.*¶¶ 136-39.)

Joynes' complaint also contains allegations with respect to the State Agency Defendants and the Ad Hoc Committee. With respect to the State Agency Defendants, Joynes alleges that the following process deprives him of his constitutional rights: (1) the DCSE, through the Delaware DOJ, files a petition for child support based on unverified allegations by the "custodial" parent and stating that the "non-custodial parent" is "absent" and, therefore, not supporting his or her children (D.I. 2 ¶ 169-70); (2) the Delaware DOJ forwards the petition to the Family Court without validating the information contained therein for accuracy (*Id.* ¶ 171); (3) the Family Court, through a mediator, issues a summons to the non-custodial parent, denies the non-custodial parent an opportunity to contest the petition, and seizes the non-custodial parent's property in violation of the Fifth and Fourteenth Amendments to the Constitution (*Id.*¶ 172); and (4) the purpose of the State's denial of the non-custodial parent's constitutional rights is to " assure the continuation of the Federal Financial Assistance of their Child Support Enforcement Program," through depriving the non-custodial parent's due process rights, unconstitutionally taking the non-custodial parent's wages, and violating the non-custodial parent's rights to effective counsel and an impartial judge. (*Id.* ¶ 174-78.)

*4 Finally, with respect to the Ad Hoc Committee, Joynes alleges that it enables the other defendants to "accomplish their mission consistently." (*Id.* ¶ 179.) The Ad Hoc Committee, appointed by the Honorable Vincent Poppiti, then Chief Judge of the Family Court, evaluates the child support guidelines every four years, as required by Title IV-D of the Social Security Act. (*Id.* ¶ 180 .) Joynes claims that the Ad Hoc Committee is made up of members who write the rules and then "sit on the bench and rule on the rules they ... wrote." (*Id.*¶ 181.) Joynes alleges that, by making their own rules and then ruling on them, the Ad Hoc Committee has " ensured that their rules will be 'set in stone,' " and violated his rights under the due process clause of the Fourteenth Amendment and the Sixth Amendment. (*Id.*¶ 183.) According to the

complaint, the Ad Hoc Committee's actions have allowed it to receive a "financial windfall" through a trail of "conspiracy and deception." (*Id.*¶ 185.) To this end, Joynes claims that the Ad Hoc Committee "circumvents public scrutiny by having closed door meetings and deliberations," in violation of the First Amendment. (*Id.*¶ 186.)

On December 15, 2005, Demsey and Lewis filed a Motion to Dismiss for Failure to State a Claim (D.I.7.) On December 29, 2005, the state defendants filed a Motion to Dismiss (D.I.8) Joynes claims under the following theories: (1) the individual defendants in their official capacities, the State Agency Defendants, and Ad Hoc Committee are immune from suit under the Eleventh Amendment; (2) Commissioners Sackovich and Herlihy, Judge Conner, and Fitzgerald are entitled to judicial or quasi-judicial immunity from suit for their actions in connection with the child support proceedings; (3) Spizzirri is entitled to prosecutorial immunity for his actions in connection with the child support proceedings; (4) Joynes has failed to allege personal involvement by Meconi, Hayward, Governor Minner, and the individual Ad Hoc Committee members, as required by 42 U.S.C. § 1983; (5) the criminal statutes on which Joynes bases his claims do not confer a private right of action; (6) Joynes has failed to state claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1985; (7) Joynes has failed to state a claim for a civil RICO violation; and (8) dismissal of the supplemental state law claims is appropriate and within the court's jurisdiction.

### III. STANDARD OF REVIEW

The defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) . The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, as in the case of a Rule 12(b)(1) motion, the court must accept the factual allegations of the complaint as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 5

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss ." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir .1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). However, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

## IV. DISCUSSION

### A. Sovereign Immunity

**\*5** Joynes brings this civil rights suit against the individual defendants in their official and individual capacities, the State Agency Defendants, and the Ad Hoc Committee. The individual defendants contend that they are entitled to Eleventh Amendment immunity for claims brought against them in their official capacities. The State Agency Defendants and the Ad Hoc Committee content that they are entitled to immunity because they are agencies, or arms, of the State. A suit against a state agency or state official in his or her official capacity is treated as a suit against the state. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991). This is so because neither a state nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989). While a state is normally entitled to sovereign immunity, Congress may abrogate the state's immunity through a valid exercise of its

power, or the state itself may waive its immunity. *See Lavia v. Commonwealth of Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000).

Neither of the two above-mentioned sovereign immunity exceptions are relevant here. First, the state has not waived its Eleventh Amendment immunity. A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Space Age Products, Inc. v. Gilliam,* 488 F.Supp. 775, 780 (D.Del.1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673 (1974)). Such an express waiver may be made through clear constitutional or statutory language. *See Lavia,* 224 F.3d at 195. Neither the constitution nor any Delaware statute expressly waives Delaware's Eleventh Amendment sovereign immunity. *See Ospina v. Dept. of Corr.,* 749 F.Supp. 572, 579 (D.Del.1990). Therefore, the court concludes that Delaware has not clearly waived its immunity.

Finally, Congress has not abrogated the states' immunity for claims under Section 1983. *See Quern v. Jordan,* 440 U.S. 332, 345 (1979). Since Delaware's immunity has not been waived or abrogated, the court will dismiss Joynes' claims against the individual defendants in their official capacities, as well as his claims the State Agency Defendants and the Ad Hoc Committee. [FN3]

> FN3. The Ad Hoc Committee is properly considered an "arm of the state" for purposes of Eleventh Amendment immunity because its members are appointed by the Chief Judge of the Family Court, an arm of the state, and consist of Family Court Commissioners and Judges. Additionally, it functions to aid the Family Court in fulfilling its responsibilities under Title IV-D of the Social Security Act. *Cf. Hunter v. Supreme Court of New Jersey,* 951 F.Supp. 1161, 1177 (D.N.J.1996) (finding that the Eleventh Amendment bars claims brought against a court committee established by court rule).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

### B. Judicial and Quasi-Judicial Immunity

As mentioned above, Joynes has brought claims against Commissioner Sackovich, Commissioner Herlihy, and Judge Conner. Joynes' claims against these defendants fail, however, because judges [FN4] are absolutely immune from suits for monetary damages and such immunity cannot be overcome by allegations of bad faith or malice. *Mireles v. Waco,* 502 U.S. 9, 11 (1991). Moreover, judicial immunity can be overcome only if the judge has acted outside the scope of his or her judicial capacity or in the " complete absence of jurisdiction." *Id.* at 11-12. In the present case, Joynes' complaint contains no allegations that Commissioners Sackovich or Herlihy, or Judge Conner either acted outside the scope of their judicial capacity or in the complete absence of jurisdiction. Rather, Joynes' complaint expresses dissatisfaction with the judges' rulings. For example, Joynes alleges that Judge Sackovich erred in finding him liable for support because it was contrary to the proof he provided at the proceeding. (See D.I. 2 ¶ 96.) Joynes' complaint contains similar allegations with respect to Commissioner Herlihy and Judge Conner. Therefore, because Commissioners Sackovich and Herlihy, and Judge Conner are immune from suit for monetary liability, the court will dismiss Joynes' claims against them.

> FN4. Commissioners of the Family Court are entitled to judicial immunity because they perform most of the same functions as a Family Court judge. *See* Del.Code Ann. tit. 10, § 915(c) (Each Commissioner appointed by the Governor shall have, among other things, the power to: (1) hear any civil case within the jurisdiction of the Family Court; (2) order the issuance of legal process to compel the attendance of necessary parties and witnesses; (3)administer oaths and affirmations, and take acknowledgments, affidavits and depositions; (4) examine parties and witnesses; (5) accept pleas; (6) enter sentence for criminal felonies; and (7) impose sanctions).

*6 In a like manner, Mediator Fitzgerald is immune from suit. Even if the court does not consider Fitzgerald as a judicial official entitled to judicial immunity, at the very least, she is entitled to quasi-judicial absolute immunity. Quasi-judicial absolute immunity attaches when a public official's role is "functionally comparable" to that of a judge. *Hamilton v. Leavy,* 322 F.3d 776, 785 (3d Cir.2003) (quoting *Butz v. Economou,* 438 U.S. 478, 513 (1978)); *Harper v. Jeffries,* 808 F.2d 281, 284 (3d cir.1986) (finding that state parole board members were "entitled to quasi-judicial immunity when engaged in adjudicatory duties"). Factors in determining whether a public official's role is functionally comparable to that of a judge, thereby entitling her to quasi-judicial immunity, include: (1) whether the official performs a traditional adjudicatory function, in that she decides facts, applies law, and otherwise resolves disputes on the merits; (2) whether the official decides cases sufficiently controversial that, in the absence of absolute immunity, she would be subject to numerous damages actions; and (3) whether the official adjudicates disputes against a backdrop of multiple safeguards designed to protect the parties' constitutional rights. *Dotzel v. Ashbridge,* 438 F.3d 320, 325 (3d Cir.2006).

Here, Fitzgerald is employed as a mediator by the Family Court. Family Court Civil Procedure Rule 16 requires, in child support proceedings, "a mediation conference(s) with the parties ... [to] be held by a Court staff mediator to identify the specific areas at issue and to attempt amicable settlement of all unresolved issues...." Family Court R. Civ. P. 16(a). In other words, Fitzgerald's assigned tasks include identifying factual and legal issues, coordinating the parties' settlement efforts, and attempting to settle child support issues. *See* Family Court R. Civ. P. 16(a). In order to accomplish her tasks, Fitzgerald must use her discretion or independent judgment, which has been described as "a key feature of the tasks sheltered by judicial immunity." *Wagshal v. Foster,* 28 F.3d 1249, 1252 (D.C.Cir.1994) (holding that a court appointed mediator is protected by quasi-judicial immunity). Clearly, Fitzgerald performs functions for the Family Court that are integral to the judicial process. Therefore, the first *Dotzel* factor weighs in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 7

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

favor a finding of immunity.

Likewise, the second factor weighs in favor of immunity. "Although a mediator ... makes no final adjudication, he must often be the bearer of unpleasant news-that a claim or defense may be far weaker than the party supposed." *Wagshal,* 28 F.3d at 1253. Additionally, because the losing party cannot sue the judge, who is cloaked with judicial immunity, the mediator's decisions may prompt the party to pursue damages against her in a second forum. *Cf. Butz,* 438 U.S. at 512 ("The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. ") Here, absent immunity, the parent disappointed by the results of the pretrial mediation conference might be determined to recoup his or her losses by filing a suit in federal court. *Wagshal,* 28 F.3d at 1253. Providing a court mediator with immunity will serve to obviate the temptation on the part of the losing party "to sue the messenger whose words foreshadowed the final loss." *Id.* Accordingly, this factor weighs in favor of immunity.

*7 The third of the *Dotzel* factors, whether the official adjudicates disputes against a backdrop of multiple safeguards designed to protect the parties' constitutional rights, is also present. As previously discussed, here, Fitzgerald, as a mediator, serves to focus the issues and attempt an amicable settlement between the parties. If no settlement is reached at the completion of the mediation process, however, the court will schedule a trial in the action, during which an unsatisfied litigant could seek relief from misconduct by the mediator. Family Court R. Civ. P. 300(a). Indeed, these are the steps that Joynes took in the present case. First, Joynes participated in a mediation conference, which resulted in an interim child support order. (See D.I. 2 ¶¶ 79-80.) Dissatisfied with the result, Joynes requested a hearing in Family Court. (*Id.* ¶ 80.) His case was scheduled to be heard by Commissioner Sackovich on April 12, 2004. (*Id.* ¶ 90.) During his hearing, Joynes was able to present his views as to the propriety of Fitzgerald's interim support order. (*Id.* ¶¶ 91, 93-96.) Thus, the court concludes that there are safeguards in place, such as a hearing on the mediator's child support order, to protect the parties' constitutional rights. Having

determined that all three *Dotzel* factors weigh in favor of quasi-judicial immunity for Fitzgerald, and that she is, therefore entitled to quasi-judicial immunity, the court will dismiss Joynes claims against her.

### C. Prosecutorial Immunity

Spizzirri has moved to dismiss the claims against him on the ground of prosecutorial immunity. Spizzirri asserts that he acted in his prosecutorial capacity in Joynes' child support proceedings and, as such, enjoys absolute immunity. The court agrees.

Prosecutors are afforded absolute immunity for all activities relating to judicial proceedings. *See Imbler v. Pachtman,* 424 U .S. 409 (1976). The Third Circuit has defined the scope of absolute immunity for prosecutors as follows:
This includes activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out of court behavior "intimately associated with the judicial phases" of litigation. *See id.; Fry [v. Melaragno],* 939 F.2d [832, 838 (9th Cir.1991) ] (activity occurring as part of presentation of evidence is absolutely protected). By contrast, a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity. *Imbler,* 424 U.S. at 430-31.

*Giuffre v. Bissell,* 31 F.3d 1241, 1251 (3d Cir.1994) (quoting *Kulwicki v. Dawson,* 969 F.2d 1454, 1463 (3d Cir.1992)). A prosecutor's decision whether to initiate a prosecution is protected by absolute immunity, because that decision "is at the core of a prosecutor's judicial role." *Kulwicki,* 969 F.2d at 1463-64 (citing *Imbler,* 424 U.S. at 430-31).

In the present case, Joynes appears to allege, at most, that Spizzirri engaged in malicious prosecution. (See D.I. 2 ¶ 15.) However, Joynes has presented no facts to support this allegation. Indeed, Joynes' complaint even states that Spizzirri was acting in his capacity as a prosecutor for the state. That is, Joynes alleges that "Spizzirri was prosecuting the case for Denise Lewis and the Delaware Division of Child Support Enforcement." ( *Id.*¶ 92.) Consequently, no relief could be granted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 8

**Slip Copy, 2006 WL 2819762 (D.Del.)**
**(Cite as: Slip Copy)**

to Joynes under any set of facts that could be proven consistent with his claims against Spizzirri. As such, the court will dismiss Joynes' claims against Spizzirri.

### D. Respondeat Superior

**\*8** Joynes also brings claims against Meconi, Hayward, and Governor Minner for violating his civil rights. More particularly, Joynes alleges that Meconi, the Secretary of the DHSS, "is responsible for the administration of social programs in the State, including the administration of the Child Support Enforcement program." (D.I. 2 ¶ 10.) Joynes further alleges that Hayward, the Director of the DCSE, is "responsible for overseeing the Child Support Enforcement Agency program administration and implementation in the State of Delaware." (*Id.*¶ 11.) Minner is the Governor of the State of Delaware. (*Id.*¶ 24.) As previously discussed, Joynes alleges that he sent letters to Meconi, Hayward, and Governor Minner, on July 12, 2004, July 25, 2004, and July 27, 2004, respectively, regarding Lewis' claim that he failed to support his children, and the miscalculation of his arrearage by the Family Court. (*Id.*¶ 114.) According to Joynes, Meconi and Hayward responded to the letters, but Minner "left it up to Hayward and Meconi to settle [his] questions." (*Id.* ¶ 116.) Both responses are partially reproduced in the complaint. (See *id.* ¶¶ 113, 115.)

As previously mentioned, Hayward's letter, dated July 27, 2004, discusses the procedures used by the DCSE to verify an agency application in order to prepare a support petition. (*Id.*¶ 113.) Meconi's letter "attempt[s] to better clarify the process" of initiating a case for child support enforcement. (*Id.* ¶ 116.) The letter explains that the DCSE files a petition for child support much like an individual " walks into the court and files a petition on his or her own." (*Id.*) According to the letter, "[t]he hearing is the fact-finding venue, where the court gathers the evidence presented by the parties," and then enters an order based on the evidence presented. (*Id.*) The individual's right to due process "comes during the court hearing." (*Id.*) Finally, the letter states that the paragraphs of the petition are "merely ...

allegation[s]," and "not meant to be a negative or discriminatory remark toward the respondent." (*Id.*) Joynes filed claims pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against Meconi, Hayward, and Governor Minner, based on the above-described letters, which were sent to Joynes after the support order was entered in the Family Court proceedings. These defendants have moved to dismiss the section 1983 claims against them, arguing that Joynes has failed to allege personal involvement by them in any deprivation of a federal right.

Additionally, Joynes alleges that the individual members of the Ad Hoc Committee violated his civil rights. Joynes does not make any specific allegations with respect to the individual members. In fact, there is no mention of the individual Ad Hoc Committee members anywhere in the complaint, other than the caption. The members are not even listed individually in Joynes' "Parties" section of his complaint, wherein he lists every other individual defendant. Instead, they are treated as one defendant: the Delaware Support Ad Hoc Committee. These defendants also move to dismiss Joynes' section 1983 against them based on lack of personal involvement in the alleged wrongs.

**\*9** To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)). Here, Meconi, Hayward, Governor Minner, and the individual Ad Hoc Committee members do not dispute that they are state actors. Rather, these defendants contend that they had no personal involvement in any violation of Joynes' rights. The Third Circuit has held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). In other words, a plaintiff must allege and prove a causal connection between the defendants and the alleged wrongdoing in order to recover.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

*Rode,* 845 F.2d at 1207. A plaintiff establishes a causal connection by showing that the defendants were personally involved in the alleged deprivation of his or her constitutional rights through allegations of either personal direction or actual knowledge and acquiescence. *Id.* Finally, a plaintiff must allege personal involvement with particularity, stating the conduct, time, place, and persons responsible for the alleged civil rights violations. *Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir.2005) (citing *Boykins v. Ambridge Area Sch. Dist.,* 621 F.3d 75, 80 (3d Cir.1980)).

It appears from the complaint that Joynes named Meconi, Hayward, and Governor Minner defendants based solely upon their supervisory positions. It is well established, however, that supervisory liability cannot be imposed under section 1983 on a respondeat superior theory. *See Monell,* 436 U.S. 658; *Evancho,* 423 F.3d at 353 (" 'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.' ") Supervisory liability may attach only if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks,* 85 F.2d 1099, 1117-18 (3d Cir.1989).

Here, nothing in Joynes' complaint indicates that Meconi, Hayward, or Governor Minner were "the moving force behind" the alleged violations. Moreover, the complaint does not allege that any of these defendants were involved in the child support proceedings, or the entering of the child support order, which are the actions that Joynes' complains violated his constitutional rights. Finally, the complaint does not indicate that these defendants were aware of Joynes' allegations and deliberately indifferent to his plight. *Jones v. Delaware State Police,* No. Civ. A. 02-1637-KAJ, 2006 WL 1896200, at *4 (D.Del. July 11, 2006) (citing *Sample,* 85 F.3d at 1118). At most, Joynes complaint alleges supervisory liability for the actions taken by the DCSE and the Family Court in entering and enforcing the child support order.

Indeed, the letters that Joynes cites support the court's conclusion. Joynes' letters were not sent to Meconi, Hayward, and Minner until after the alleged deprivation of constitutional rights occurred-i.e. after the child support proceedings were completed and the child support order was entered and enforced. Given the foregoing, the court concludes that Joynes' complaint fails to state a claim for civil rights violations upon which relief may be granted as to Meconi, Hayward, and Minner. Thus, the court will dismiss Joynes' section 1983 claims against these defendants.

**\*10** The court will also dismiss Joynes' section 1983 claims against the individual Ad Hoc Committee members, because Joynes does not allege that they were personally involved in any deprivation of his civil rights. Joynes' complaint fails to state any allegations concerning any individual Ad Hoc Committee member, much less the particularized allegations of conduct, time, place, and persons responsible required to state a section 1983 claim. That is, Joynes' allegations of civil rights violations pertain only to the Ad Hoc Committee as a whole, and not to the individual members. For example, Joynes alleges that "[t]hey [the Ad Hoc Committee] have been able to establish vague and ignorant rules and laws pertaining to child support." (D.I. 2 ¶ 23.) These allegations, however, are not sufficient to state a claim against the individual Ad Hoc Committee members. Accordingly, the court will dismiss Joynes' section 1983 claims against them.

### E. Joynes' Claims Arising Under Criminal Statutes

Joynes' complaint alleges that the defendants violated several criminal statutes, including 18 U.S.C. § 241 (conspiracy against rights), 18 U.S.C. § 1503 (influencing or injuring officer or juror), 18 U.S.C. § 1512(b),(c),(d) (tampering with a witness, victim, or informant), 18 U.S.C. § 1581 (peonage; obstructing enforcement), 18 U.S.C. § 1584 (sale into involuntary servitude), and 18 U.S.C. § 1589 (forced labor). These statutes pertain to criminal proceedings and do not confer jurisdiction as to the civil controversy described in the complaint. *Nat'l Bank of Mattoon v. Daviditis,* 262 F.2d 884, 886

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 10

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

(7th Cir.1959); *Sordean v. United States,* NO. C 94-2387 FMS, 1995 WL 86548, at *2 (N. D.Cal. Feb. 24, 1995). The statutes Joynes alleges that the defendants violated all impose criminal penalties on persons found guilty of violating their provisions. The decision of whether to prosecute, and what criminal charges to bring generally rests with the prosecutor. *See United States v. Batchelder,* 442 U.S. 114, 124 (1979). Finally, a private cause of action is not authorized by any of the statutes that Joynes alleges the defendants have violated. *See Stern v. Halligan,* 158 F.3d 729, 731 n. 1 (3d Cir.1998) (finding no private cause of action under 18 U.S.C. § 241); *Thompson v. Kramer,* Civ. A. No. 93-2290, 1994 WL 725953, at *15 (E.D.Pa. Dec. 29, 1994) (citing *Harberson v. Hilton Hotels Corp.,* 616 F.Supp. 864, 866 (D.Colo.1985), for the proposition that no private cause of action exists under 18 U.S.C. § 1503); *Gipson v. Callahan,* 18 F.Supp. 662, 668 (W.D.Tex.1997) (section 1512 does not provide a private right of action); *Turner v. Unification Church,* 473 F.Supp. 367, 375-75 (D.R.I.1978) (no private cause of action under 18 U.S.C. § 1581, and no private cause of action generally arising out of the Thirteenth Amendment); *Bhagwanani v. Howard Univ.,* 355 F.Supp.2d 294, 301 n. 5 (D.D.C.2005) (no private cause of action under 18 U.S.C. § 1584). Given the foregoing, the court will dismiss Joynes' claims against the defendants for violations of criminal statutes.

### F. State Actors

**\*11** Joynes also brings Section 1983 claims against Lewis and Demsey. Although Joynes claims that Lewis and Demsey are "cloaked 'under the color of law,' " neither of these defendants fit within the meaning of "state actor" under section 1983.

As previously discussed, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)). To act under "color of state law," a defendant must be "clothed with the authority of

state law." *West,* 487 U.S. at 49. Here, Lewis is a private individual who took legal measures to obtain child support for her and Joynes' son. Demsey is merely the lawyer who represented Lewis in the legal proceedings. Quite simply, these defendants are not "clothed with the authority of state law." *See Reichley v. Pennsylvania Dep't of Agric.,* 427 F.3d 236, 244-45 (3d Cir.2005); *Biener v. Calio,* 361 F.3d 206, 216-17 (3d Cir.2004). As such, the court will dismiss Joynes' section 1983 claims against Lewis and Demsey.

### G. Joynes' Section 1981 and 1985 Claims

Joynes' complaint alleges that most, if not all, of the defendants violated his civil rights pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1985. Having already dismissed all claims against the Delaware State Agencies, the Ad Hoc Committee, Commissioners Sackovich and Herlihy, Judge Conner, Fitzgerald, and Spizzirri, the court will only address Joynes' claims as they pertain to the remaining defendants, Meconi, Hayward, Governor Minner, Lewis, Demsey, and the individual Ad Hoc Committee members.

#### 1. Joynes' Section 1981 Claims

Count Three of Joynes' complaint seeks to hold Meconi, Hayward, Governor Minner, Lewis, Demsey, and the individual Ad Hoc Committee members liable for violations of his civil rights under 42 U.S.C. § 1981(a), which states:
(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). In order to state a claim under section 1981, a plaintiff "must allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts...." *Brown v. Phillip Morris, Inc.,* 250 F.3d 789, 797 (3d Cir.2001) (citation omitted).

**\*12** After having considered the allegations in the complaint, the court concludes that Joynes has failed to demonstrate intentional discrimination on the part of Meconi, Hayward, Governor Minner, Lewis, Demsey, or the individual Ad Hoc Committee members. Joynes' complaint is completely devoid of any allegations concerning discrimination on the basis of race, including any allegation that is he a member of a racial minority. Also absent from Joynes' complaint are any allegations regarding the one or more activities enumerated in the statute. Indeed, the only allegation in Joynes' complaint regarding section 1981 is the language of the statute itself. Therefore, the court concludes that Joynes has not stated a claim for the violation of 42 U.S.C. § 1981, and will grant the defendants' motion to dismiss his section 1981 claims.

2. Joynes' Section 1985 Claims

Joynes has also brought conspiracy claims against Meconi, Hayward, Governor Minner, Lewis, Demsey, and the individual Ad Hoc Committee members, pursuant to 42 U.S.C. § 1985(2) and (3). Section 1985 prohibits conspiracies motivated by racial or class-based discrimination. The court will first examine Joynes' claim under section 1985(2), and then turn to his claim under section 1985(3). In order to state a claim under 42 U.S.C. § 1985(2), which provides a cause of action against persons who conspire to obstruct justice, Joynes must allege that:

two or more persons ... conspired to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified ...; or two or more persons conspired for the purpose of

impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2). The two categories in which a cause of action under Section 1985(2) will lie are " (1) when there has been obstruction of justice, including, for instance, intimidating or injuring a witness, and (2) when there has been a conspiracy for the purpose of impeding the due course of justice in any state or territory." *Altieri v. Penn. State Police,* No. Civ. A. 98-CV-5495, 2000 WL 427272, at *16 (E.D.Pa. Apr. 19, 2000) (citing *Messa v. Allstate Ins. Co.,* 897 F.Supp. 876, 881 (E.D.Pa.1995)). Joynes' complaint fails to state upon which category of Section 1985(2) he bases his claim. However, an analysis under either category demonstrates that Joynes' Section 1985(2) claims must fail.

Turning to the first category of Section 1985(2), Joynes has not alleged that there was any obstruction of justice involving a witness or prospective witness in a federal court proceeding. Indeed, his complaint alleges only the defendants " had full knowledge of the wrongs conspired to be done as alluded to in 42 U.S .C. § 1985, or wrongs about to be committed, and having the power to prevent or aid in preventing the same, neglected or refused to do that which by reasonable diligence could have prevented." (D.I. 2 ¶¶ 10-17, 20, 22-26.) With respect to the second category of Section 1985(2), Joynes has not alleged any facts to support a claim that a conspiracy existed to obstruct justice in a manner that would deprive him of equal protection of the law. *See Altieri,* 2000 WL 427272, at *16. That is, although Joynes broadly alleges a conspiracy in his complaint, he has failed to allege specific facts that reveal how these defendants acted in concert to deprive him of his constitutional rights.

**\*13** Likewise, Joynes has failed to state a claim under section 1985(3), which provides, in pertinent part:
If two or more persons in any State or Territory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 12

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). In order to state a claim under section 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (citing *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 835, 828-29 (1983); *Griffen v. Breckenridge,* 403 U.S. 88, 102 (1971)). Here, as with his section 1985(2) claims, Joynes merely states the language of the statute and makes broad allegations with respect to a conspiracy and the deprivation of his right to equal protection of the laws. These allegations are not sufficient to uphold a claim for conspiracy under section 1985(3). For these reasons, the court will dismiss Joynes' section 1985 claims against Meconi, Hayward, Governor Minner, Lewis, Demsey, and the individual Ad Hoc Committee members.

### H. Joynes' Civil RICO Claims

Joynes alleges civil RICO claims against the defendants. To advance a civil claim under RICO, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004) (citing *Sedema, S.P.R.L. v. Imrex Co., Inc.,* 473 U .S. 479 (1985)). A "pattern of

racketeering activity" requires at least two " predicate acts," which may include mail fraud or obstructing justice. *Id.;* 18 U.S.C. § 1961(1), (5). After reviewing Joynes' complaint liberally, and in the light most favorable to him, the court concludes that it is devoid of any language that could be construed to allege a civil RICO violation. In fact, the word RICO, or any reference thereto, appears in only one paragraph of Joynes' complaint-paragraph 8, in which Joynes states, in the form of a laundry list, the claims he is asserting against the defendants. The complaint does not even discuss a " pattern of racketeering activity," as required by the Third Circuit. Thus, the court concludes that it appears beyond doubt that Joynes can prove no set of facts in support of his civil RICO claims that would entitle him to relief. Accordingly, the court will dismiss these claims.

### I. Joynes' State Law Claims

*14 Joynes' complaint brings state law claims against the defendants for intentional infliction of emotional distress and negligent infliction of emotional distress. (D.I. 2 ¶ 8.) The only basis for the court to consider these claims is under supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. Once a court dismisses a plaintiff's federal claims, it is within its discretion to retain jurisdiction over the state law claims. *See* 28 U.S.C. § 1367; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 444 (3d Cir.1997). Section 1367 states, in pertinent part, that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3). Here, the parties have not yet engaged in discovery or invested significant resources in litigating the state law claims in this forum. Thus, declining to exercise jurisdiction in this matter "would not be unfair to the litigants or result in waste of judicial resources." *Queen City Pizza,* 124 F.3d at 444. Given the foregoing, the court will dismiss Joynes' state law claims without prejudice to his ability to bring them in state court.

### ***ORDER***

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 13

Slip Copy, 2006 WL 2819762 (D.Del.)
**(Cite as: Slip Copy)**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. Demsey and Lewis' Motion to Dismiss for Failure to state a Claim (D.I.7) is GRANTED.

2. The state defendants' Motion to Dismiss (D.I.8) is GRANTED.

3. The court will dismiss Joynes' federal claims with prejudice.

4. The court will dismiss Joynes' state claims without prejudice to his ability to bring them in a state court action.

5. The Clerk of Court is directed to close this case.

D.Del.,2006.
Joynes v. Meconi
Slip Copy, 2006 WL 2819762 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in F.Supp.2d                                                                                      Page 1

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Crosby v. Georgakopoulos
D.N.J.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Clynt CROSBY, Plaintiff,
v.
Demetrios G. GEORGAKOPOULOS, DHS District
Director, Bureau of Immigration and Customs
Enforcement–"Bice," Warden Ralph Green-HCCC,
Hudson County, Keefe Commisary Network Sales,
Attorney General John Ashcroft, Defendant(s).
**No. Civ. 03-5232(WGB).**

June 24, 2005.

Clynt Crosby, # 134236, South Kearny, New
Jersey, Plaintiff, pro se.
Christopher J. Christie, United States Attorn, By:
Anthony J. Labruna, Jr., Assistant United States
Attorney, Newark, NJ, for Defendants Demetrios G.
Georgakopoulos, DHS District Director-BICE and
Attorney General John Ashcroft.
Donato J. Battista, Hudson County Counsel, By:
Michael L. Dermody, First Assistant County
Counsel, Jersey City, NJ, for Warden Ralph
Green-HCCC and Hudson County.

*OPINION*
BASSLER, Senior J.
**\*1** Plaintiff Clynt Crosby ("Crosby") is an
immigration detainee at the Hudson County
Correctional Center ("HCCC"). Crosby claims to be
suffering from various prison conditions including
secondhand smoke, extreme cold, gang activity and
unsanitary food trays in violation of his Eighth
Amendment rights. He brings his action against
both federal and state defendants in their official
and individual capacities.

There are two pending motions in the above-titled
action to dismiss Crosby's Amended Complaint.
First, there is a motion to dismiss and/or for
summary judgment brought by defendants Warden
Ralph Green ("Warden Green") and Hudson
County. Second, there is a motion to dismiss and/or
for summary judgment brought by defendants
Demetrios G. Georgakopoulos ("Georgakopoulos"
), District Director of the Bureau of Immigration
and Customs Enforcement, and John Ashcroft ("
Ashcroft"), United States Attorney General.

This Court has subject matter jurisdiction under 42
U.S.C. § 1981, 28 U.S.C. § 1331, and *Bivens v. Six
Unknown Named Agents of Federal Bureau of
Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d
619 (1971). Venue is proper under 28 U.S.C. §
1391(b),(e).

For the following reasons, the motion to dismiss by
Georgakopoulos and Ashcroft, in their official and
individual capacities, is granted. The motion to
dismiss by Hudson County is granted. The motion
to dismiss by Warden Green in his official capacity
is granted. The motion to dismiss by Warden
Green in his individual capacity on Crosby's claims of
gang activity, poor air ventilation, unsanitary food
trays, spoiled food, and high cost telephone calls is
granted. The motion to dismiss by Warden Green in
his individual capacity on Crosby's claims of
second-hand smoke exposure and cold temperature
is denied.

#### I. BACKGROUND

Crosby, proceeding pro se, filed the initial
Complaint against six defendants: (1) the
Department of Homeland Security ("DHS"); (2)
Georgakopoulos; (3) Ashcroft; (4) Warden Green;
(5) HCCC; and (6) Keefe Commisary Network,
L.L.C. ("Keefe"). On December 9, 2003, this Court
dismissed with prejudice all claims against the DHS
and dismissed without prejudice all claims against
Ashcroft and Georgakopoulos. In addition, the
Court held that HCCC could not be sued for
constitutional violations pursuant to *Monell v. Dept.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

*of Social Services of New York City,* 436 U.S. 658, 688-690 (1978). Nevertheless, this Court allowed those claims against HCCC to survive by construing claims brought against HCCC as claims against Hudson County.

On January 29, 2004, Crosby filed an Amended Complaint. The defendants named in the Amended Complaint were: (1) Keefe; (2) Warden Green; (3) Hudson County; (4) Ashcroft; and (5) Georgakopoulos. Crosby alleged cruel and unusual punishment in violation of the Eighth Amendment by these defendants, including dirty and dangerous prison conditions and exposure to second-hand smoke. Keefe subsequently filed a motion to dismiss the Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), which this Court granted on August 17, 2004. The United States Attorney, on behalf of Georgakopoulos and Ashcroft ("Federal Defendants"), moved to dismiss on August 17, 2004. Hudson County Counsel, on behalf of Warden Green and Hudson County ("State Defendants"), moved to dismiss on January 7, 2005.

## II. DISCUSSION

### A. Standard of Review

*2 Federal Rule of Civil Procedure 12(b)(6) allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted." In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). Dismissal is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) ; *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.,* 311 F.3d 198, 215 (3d Cir.2002) (internal citations

omitted). The Court need not, however, credit a pro se plaintiff's "bald assertations" or "legal conclusions." *Id.*

Typically courts only look to the face of the pleadings in considering motions made under Rule 12(b)(6). However, courts may examine a " document integral to or explicitly relied upon in the complaint without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (internal citations omitted).

### B. Constitutional Claims

#### 1. Eighth Amendment Standard

Plaintiff asserts that the prison conditions of the HCCC violate his Eighth Amendment protections against cruel and unusual punishment. Section 1983 of the Civil Rights Act of 1871 provides "a federal remedy against any person who, acting under color of state law, deprives another of constitutional rights." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258 (1981). In *Bivens,* the Supreme Court recognized an implied right of action for damages in federal court where a federal agent acting under color of federal authority deprived the plaintiff of constitutional rights. 403 U.S. at 397, 91 S.Ct. at 2005. "A *Bivens* action ... is the federal equivalent of the § 1983 cause of action against state actors." *Brown v. Philip Morris,* 250 F.3d 789, 800 (3d Cir.2001).

The Eighth Amendment's "Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes...." *Fuentes v. Wagner,* 206 F.3d 335, 344 n. 11 (3d Cir.2000) (quoting *Whitley v.. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Thus, Eighth Amendment protections apply only after a formal adjudication of guilt. *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40 (1977); *see also City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983 (1983) (holding that Eighth Amendment has no application to a person who had not yet been convicted at the time he required

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

medical care). Pre-trial detainees whose imprisonment did not result from the conviction of a crime cannot assert the Eighth Amendment in protecting their constitutional rights. *Hubbard v. Taylor,* 399 F .3d 150, 164 (3d Cir.2005).

*3 Crosby is an immigration detainee. He is not confined at the HCCC as a result of the conviction of a crime. "As a person detained for deportation, plaintiff's status is equivalent to a pretrial detainee, whose constitutional claims are considered under the due process clause ... instead of the Eighth Amendment." *Gonzalez-Cifuentes v. United States Dep't of Homeland Sec.,* 04-4855(WHW) 2005 WL 1106562, at *6 (D.N.J. May 3, 2005) (citing *Hubbard,* 399 F.3d at 158); *see also Despaigne v. Crolew,* 89 F.Supp.2d 582, 585 (E.D.Pa.2000) (finding that an immigration detainee is analogous to a pre-trial detainee). Crosby, as a detainee who has not been convicted of any crime, may not assert an Eighth Amendment violation against defendants.

Considering Crosby's claims all rely on Eighth Amendment violations, the Court need not address their merits. Nevertheless, because a pro se plaintiff's complaint is construed more liberally, the Court will proceed to address Crosby's claims as though he asserted them properly under the Due Process Clause of the Fifth Amendment against Federal Defendants and under the Due Process Clause of the Fourteenth Amendment against State Defendants. Failing to plead claims under due process does no lasting damage. The Supreme Court has concluded that the rights of pre-trial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 581 (3d Cir.2003) (quoting *City of Revere,* 467 U.S. 239 at 244, 103 S.Ct. at 2983.) The Third Circuit Court of Appeals has recognized that "pretrial detainees are entitled to greater constitutional protection than that provided by the Eighth Amendment." *Hubbard,* 399 F.3d at 167 n. 23 (internal citations omitted).

### 2. Due Process Standard

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process ... the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872 (1979). To determine whether the conditions amount to punishment, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose." *Id.* at 538, 99 S.Ct. at 1873. The Eighth Amendment standard of "deliberate indifference" to inmate health and safety by prison officials does "seem to establish a floor of sorts" for the due process inquiry into Crosby's claims. *Kost v. Kozakiewicz,* 1 F.3d 176, 188 n. 10 (3d Cir.1993). In evaluating a pre-trial detainee's claims, the Third Circuit Court of Appeals has "found no reason to apply a different standard than that set forth in *Estelle* (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment)...." *Natale,* 318 F.3d at 581 (citing *Estelle v.. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that the Eighth Amendment prohibits deliberate indifference to prisoners' serious medical needs)). " 'Deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm." *Gonzales-Cifuentes,* 2005 WL 1106562, at *7 (citing *Farmer v. Brennan,* 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

### C. *Claims Against State Defendants*

*4 From Crosby's Amended Complaint, it appears that Crosby alleges the following claims against Warden Green: (1) exposure to second-hand smoke; (2) cold temperatures in cells and gym; (3) gang activity; (4) spoiled food; (5) poor air ventilation; (6) unsanitary food trays; and (7) high cost telephone calls. Am. Compl. 7-9. Crosby alleges that Warden Green, in his official and personal capacity, ignored Crosby's multiple grievances as well as the many problems in the prison. *Id.* at 8. Crosby further alleges that Hudson County is liable as the location where the violations occurred. *Id.* at 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 4

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

### 1. Eleventh Amendment Immunity

The Eleventh Amendment bars Crosby from bringing suit against Warden Green in his official capacity. The Eleventh Amendment precludes federal jurisdiction over a state absent the state's consent to suit. *Seminole Tribe v. Florida,* 517 U.S. 44, 54 (1997). State agencies and state officers who act on behalf of the state are also protected by Eleventh Amendment immunity. *Natural Res. Def. Council v. Ca. Dep't of Transp.,* 96 F.3d 420 (9th Cir.1996) (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 142-46 (1993) and *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984)). "[A]n official capacity suit 'is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 362 (1991) (quoting *Will v. Mich. Dep't. of State Police,* 491 U.S. 58, 71 109 S.Ct. 2304, 2312 (1989)). Under § 1983, state officials acting in their official capacities like Warden Green, are not "persons." *Id.* Therefore, the Court dismisses Warden Green in his official capacity from Crosby's action.

"Personal capacity suits on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* at 25, 112 S.Ct. at 362. Since "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983," the Eleventh Amendment does not bar suit. *Id.* at 31, 112 S.Ct. at 365. Rather, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel J.M.K. v. Luzerne County Juvenile Det. Ctr.,* 372 F.3d 572, 586 (3d Cir.2004). Therefore, the Eleventh Amendment does not bar Crosby's suit against Warden Green in his individual capacity.

### 2. Qualified Immunity

Although not explicitly stated in the State Defendants' brief, it appears that the State Defendants bring a qualified immunity defense with

respect to Warden Green's liability as the ultimate supervisor of the HCCC.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior.*" *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) (internal citations omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence," but allegations must be made with "appropriate particularity." *Id.* Crosby alleges that Warden Green, by "failing to oversee or properly supervise officer [sic] under his charge, became personally involved in the wrongdoing." Am. Compl. 8. Therefore, to the extent that Crosby attempts to place liability on Warden Green on the basis of *respondeat superior* for the actions of his subordinates, Crosby's claims lack merit. The Court dismisses all claims by Crosby against Warden Green solely as the supervisor of the officers who are personally involved in the action.

### 3. Claim of Second-Hand Smoke Exposure

\*5 A valid cause of action under the Eighth Amendment exists when an inmate alleges that prison officials have exposed the inmate to levels of environmental tobacco smoke ("ETS") that "pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney,* 509 U.S. 25, 35 113 S.Ct. 2475, 2481 (1993). Deliberate indifference by prison authorities is determined in light of prison officials' current attitudes and conduct. *Id.*

Crosby alleges that although the HCCC has a no smoking policy, the policy is continuously violated by both officers of the HCCC and inmates. In Crosby's Amended Complaint, he notes that "on an [sic] average ... 34 of the 55 [inmates] are active smokers, from morning till night, in the cells, day room, constantly smoking." Am. Compl. 8. Crosby alleges the constant smoking causes risk of emphysema as well as "daily headaches, [for which] the only medical solution is Motrin...." Am. Compl. 9, 14. Taking Crosby's allegations to be true, any smoking in the HCCC in violation of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

no-smoking policy would be unreasonable and considered a form of punishment against pre-trial detainees. The Court cannot conceive of any legitimate government purpose in violating a facility policy, nor is it rationally related to the purpose of detaining inmates. There is also a factual dispute over whether Crosby filed a second-hand smoke grievance with Warden Green. Discovery may reveal relevant information as to whether Warden Green acted with deliberate indifference. In analyzing the merits of Crosby's claim, adoption of a smoking policy will "bear heavily on the inquiry into deliberate indifference." *Id.* At this juncture, it would be premature to grant dismissal of Crosby's ETS claim because discovery has not commenced.

The State Defendants point the Court to *Steading v. Thompson,* 941 F.2d 498 (7th Cir.1991), which holds that prison authorities do not violate the Eighth Amendment by failing to provide a smoke-free environment. The State Defendants' reliance on *Steading* is misplaced. The prison in *Steading* did not have a smoke-free policy. *Id.* at 499. Absent any existing smoke-free policy, prison authorities who decide in favor of permitting smoking in their buildings do not violate the Eighth Amendment. *Id.* at 500. If indeed the prison officials at HCCC are ignoring Crosby's exposure to high levels of ETS in an environment where smoking is prohibited, Crosby states a valid claim for relief.[FN1] "[I]t would be unreasonable for prison officials to believe that they were not violating the prisoners' Eighth Amendment rights ... [where] '[p]laintiff's allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from inter alia, under-enforcement of inadequate smoking rules, overcrowding of inmates, and poor ventilation." *Atkinson v. Taylor,* 316 F.3d 257, 264 (3d Cir.2003) (quoting *Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999)). The Court denies the State Defendants' motion to dismiss Plaintiff's second-hand smoke inhalation claim.

FN1. The State Defendants also argue that according to the Prison Litigation Reform Act, 32 U.S.C.A. § 1997(e)(a), Crosby cannot bring suit until he has exhausted all his administrative remedies. The State Defendants maintain that Crosby never filed a grievance for second-hand smoke. The Court declines to convert this motion to dismiss into one for summary judgment by looking beyond the pleadings. Nevertheless, the Court observes that Crosby's Statement of Material Fact alleges that he did file a specific grievance for second-hand smoke, copies of which have been confiscated. These disputed facts would be sufficient to overcome summary judgment, particularly where, as here, the parties have yet to engage in discovery.

### 4. Claim of Cold Temperature

*6 "Prisoners have a right under the Eighth Amendment to be free from extreme hot and cold temperatures." *Freeman v. Berge,* 2003 WL 23272395 at *12 (W.D.Wis. Dec. 17, 2003) (internal citations omitted). "The same Eighth Amendment standard applies to cell temperatures as to other conditions of confinement: whether the temperatures subject the inmate to a substantial risk of serious harm." *Id.* In *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327 (1991), the Supreme Court noted,

[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

Crosby alleges the same combination of conditions as in the example provided by the Supreme Court in *Wilson.* Crosby states that there is no heat in the cells or the gym. Am. Compl. 7. Night temperatures are "sub-zero," and the officers refuse to provide extra blankets. *Id.* Moreover, Crosby alleges that the cold is causing the joints in his hand to swell. *Id.* at 13. This combination of allegations describing Crosby's deprivation of warmth potentially amount to punishment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 6

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

In terms of Warden Green's liability, a supervisor can be found personally involved in the deprivation of a plaintiff's rights when, "[a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong...." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal citations omitted). Crosby filed a specific grievance regarding cold temperatures, addressed to Warden Green. Because Crosby alleges that Warden Green received notice of the cold temperatures and "failed to remedy the wrong," the Court denies Warden Green's motion to dismiss with respect to Crosby's cold temperature claim.

### 5. Claim of Gang Activity

Crosby alleges that Warden Green failed to protect inmates from known gang members who act violently against other inmates. Am. Compl. 7. He makes general allegations that federal inmates constantly get into fights with gang members and that there has been no response to his grievances. *Id.* at 8. The State Defendants assert, and the Court agrees, that Crosby is only generally concerned about gang activity due to the fact that both prisoners and detainees are housed together. Crosby does not allege that he is under any specific threat from any other inmate or that Warden Green " participated in violating the plaintiff's rights, directed others to violate them" or "had knowledge of and acquiesced in his subordinates' violations" of failing to protect Crosby. *A.M. ex rel J.M.K.,* 372 F.3d at 586. Based on such general allegations by Crosby, the Court cannot find Warden Green to be deliberately indifferent, objectively or subjectively, to any substantial risk of harm. Rather, "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878. Because Crosby does not allege activity amounting to any sort of punishment against him, the Court dismisses Crosby's claim regarding gang activity.

### 6. Claims of Poor Air Ventilation, Unsanitary Food

Trays, Spoiled Food, and High Cost Calls.

*7 Crosby alleges various other prison conditions violations regarding poor air ventilation, the unsanitary use of food trays, spoiled food, and prohibitively high costs for telephone calls. The State Defendants properly direct the Court to *Marnin v. Pinto,* 463 F.2d 583, 584 (3d Cir.1972), in which the appellant made "blanket statements" alleging bad food and miserable living conditions. The Third Circuit Court of Appeals stated that " naked statements such as this do not ordinarily merit Federal court intervention." *Id.* Likewise, Crosby's claims are conclusory and do not merit a cause of action under § 1983. The Court notes that, in evaluating prison conditions cases, "the Eighth Amendment is not a basis for broad prison reform ... Any needed prison reform is an executive and legislative responsibility." *Doty v. County of Lassen,* 37 F.3d 540, 543 (9th Cir.1994) (internal quotes omitted). Crosby's claims are not sufficient to allege any form of punishment. Instead they appear to be incident to the governmental purpose of detainment. "The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed." *Bell,* 441 U.S. at 539 n. 19, 99 S.Ct. at 1874 n. 19. Thus, the Court dismisses Crosby's claims with respect to poor air ventilation, the unsanitary use of food trays, spoiled food, and prohibitively high costs for telephone calls.

### 7. Hudson County's Liability

In *Monell,* the Supreme Court held that municipalities, such as Hudson County, may be held liable under § 1983. 436 U.S. at 690, 98 S.Ct. at 2035. Municipalities, however, cannot be held liable for § 1983 claims under a theory of *respondeat superior. Id.* at 691, 98 S.Ct. at 2036. " Instead, it is when execution of a [local] governmen t's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [local] government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037-38. In order to hold Hudson County liable for any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

constitutional violations, "there must be an affirmative link between the policy and the particular violation alleged." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436 (1985).

Crosby merely alleges that Hudson County is where the "illegal/wrongful policies are made...." Am. Compl. 6. He does not allege any specific policies implemented by Hudson County that are in violation of his rights. Because Crosby does not state an adequate claim against Hudson County, the Court dismisses Hudson County from Crosby's action.

### 8. Products Liability Claim

To the extent that any claims against Hudson County remain, the Court construes the remainder as claims brought under a theory of products liability. Counsel for Hudson County refers to this Court's August 17, 2004 Opinion dismissing Keefe to assert that Hudson County should be dismissed under the same products liability theory construed from Crosby's second-hand smoke allegations. The New Jersey Products Liability Act relieves "product sellers" from liability after filing an affidavit identifying the manufacturer of the product unless the seller (1) exercised significant control over the design, manufacture, packaging or labeling of the product; (2) knew or should have known about the product defect; or (3) created the product defect. N.J.S.A. 2A:58C-9(a)-(b), (d). The Court agrees that Hudson County, which contracted with Keefe to sell products in the HCCC Commissary, is further removed than Keefe as a product seller. Hudson County is not a manufacturer of any sort, let alone a manufacturer of any products that cause harm from second-hand smoke. Thus, Hudson County cannot be held liable under the statute and is dismissed from any products liability claim on the same grounds as Keefe. (*See* Aug. 17, 2004 Op.)

### D. *Claims against Federal Defendants*

**\*8** Crosby alleges that Georgakopoulos, in his official and individual capacity, failed to respond to

Crosby's grievances and to secure a healthy environment for immigration detainees. Am. Compl. 12-13. Crosby further alleges that Ashcroft, in his official and individual capacity, is responsible for the actions of his subordinates and failed to properly inspect the facilities prior to approving them for use by immigration detainees. *Id.* at 14-15. The claims against the Federal Defendants in their official capacity are dismissed under the doctrine of sovereign immunity. The claims against the Federal Defendants in their individual capacity are dismissed under the doctrine of qualified immunity.

### 1. Sovereign Immunity

It is well-settled that in the absence of an express waiver of immunity by Congress, the United States, its agencies, or officers are immune from suit. *Dep't of Army v. Blue Fox, Inc.* 525 U.S. 255, 260, 119 S.Ct. 687, 690 (1999); *Beneficial Consumer Disc. Co. v. Poltonowicz,* 47 F.3d 91, 93-94 (3d Cir.1995) (internal citations omitted). Therefore, when a federal agency's officer is named in an action, Congress must have consented to the action because the United States is the real party in the suit. *Terrill Manor Assocs. v. United States Dep't of Housing & Urban Dev.,* 496 F.Supp. 1118, 1121 n. 5 (D.C.N.J.1980). See Hafer, 502 U.S. at 25, 112 S.Ct. at 361 ("real party in interest in an official-capacity suit is the governmental entity and not the named official"). "Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their role in the litigation." Hafer, 502 U.S. at 25, 112 S.Ct. at 361.

The Federal Tort Claims Act ("FTCA") partially waives sovereign immunity for injuries "caused by the negligent or wrongful act or omission of any employee of the Government, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). This waiver, however, does not subject the United States to liability for constitutional tort claims. *FDIC v. Meyer,* 510 U.S. 471, 478 114 S.Ct. 996, 1001 (1994); *Biase v. Kaplan,* 852 F.Supp. 268, 279 (D.N.J.1994). Under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

the FTCA, the "law of the place where the act or omission occurred" is state law. *Id.* "By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a constitutional right." *Id.* In this case, Crosby has only sued for alleged violations of his constitutional right to be free from cruel and unusual punishment. Federal and not state law applies to this case.

Sovereign immunity is a jurisdictional issue. *Meyer* 510 U.S. at 475, 114 S.Ct. at 1000. Because constitutional claims are not cognizable under the FTCA, and the United States has not waived its sovereign immunity, this Court lacks jurisdiction to hear Crosby's claims against Federal Defendants. [FN2] The Court therefore dismisses Crosby's claims against Federal Defendants in their official capacity pursuant to Fed.R.Civ.P. 12(b)(1).

> FN2. Crosby's argument that his action is not a tort against the United States because the Federal Defendants' actions are "not one of discretion but mandated through the administrative process" is unfounded. The scope of the Federal Defendants' discretionary or administrative duties is irrelevant to whether sovereign immunity applies to them. There is a discretionary function exception to the waiver of sovereign immunity by the FTCA. *See* 28 U.S.C. § 2680(a). But whether or not the Federal Defendants' actions were discretionary, the FTCA does not apply to Crosby's constitutional tort claims. Crosby's reference to the Foreign Sovereign Immunities Act ("FSIA") in his reply brief is likewise irrelevant. The FSIA only applies to foreign states claiming immunity.

2. Qualified Immunity

**\*9** Sovereign immunity does not bar Plaintiff from bringing a constitutional tort claim against the Federal Defendants in their individual capacities. *Hines v. Irvington Counseling Ctr.,* 933 F.Supp. 382, 388 (D.N.J.1996). Nevertheless, the Federal Defendants assert a valid qualified immunity

defense. Government officials such as the Federal Defendants are generally shielded from liability for civil damages in their individual capacity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person should have known." *Smith v. Marasco,* 318 F.3d 497, 510 (3d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

Just as *respondeat superior* cannot be the basis of liability in a § 1983 action, *Givens v. Jones,* 900 F.2d 1229, 1233 (8th Cir.1990), "the Courts of Appeals have unanimously rejected the contention ... that the doctrine of *respondeat superior* is available against a municipal entity under a *Bivens* -type action implied directly from the Fourteenth Amendment." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989) (internal citations omitted).

Crosby's allegations demonstrate that he is attempting to hold the Federal Defendants liable for the actions of others in failing to respond to grievances. He explicitly alleges that Ashcroft "is responsible for the action [sic] of his subordinates." Am. Compl. 15. Moreover, Crosby claims that Georgakopoulos, "through the deliberate indifference of prison official [sic] to my rights failed to respond to my cries for help." *Id.* at 12. As the Federal Defendants point out, neither of them are directly responsible for, or in direct control of, the conditions at the HCCC, which is a Hudson County, New Jersey facility, contracted by the United States to hold immigration detainees. Crosby cannot hold the Federal Defendants responsible for the actions of officials within the HCCC because *Bivens* liability requires proof of direct personal responsibility. *See Pellegrino v. United States,* 73 F.3d 934, 936 (9th Cir.1996). Therefore, any claims by Crosby against the Federal Defendants under a theory of *respondeat superior* are dismissed.

Crosby's claims are similar to those of the plaintiff in *Rode v.. Dellarciprete.* In *Rode,* the plaintiff filed grievances with the Governor's office of administration and alleged that the Governor and Attorney General had personal knowledge because they had the power to review and approve agency regulations. 845 F.2d at 1208. The Third Circuit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Court of Appeals, however, dismissed plaintiff's claims against the Governor and Attorney General as insufficiently alleging personal involvement. *Id.* The Third Circuit Court of Appeals held that "[t]he power to review and approve a departmental regulation for form and legality, however, does by no means charge the Governor and Attorney General with the duty to enforce that regulation." *Id.* Moreover, "a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor's office of administration or to the Lieutenant Governor's office." *Id.* Likewise, although Crosby alleges that Ashcroft is responsible for ensuring that "all facilities are to standard ... before approval for use is given," Am. Compl. 15, this power does not charge Ashcroft with the duty to enforce the regulation. Crosby's claim that Georgakopoulos' office failed to respond to Crosby's letters and complaint are insufficient to show that Georgakopoulos had actual knowledge of Crosby's complaints as well. Crosby's reply brief, which further elaborates on conditions at the HCCC, fails to support personal involvement by Federal Defendants. Thus, the Federal Defendants have not violated any recognized constitutional rights. The Supreme Court admonishes against permitting "insubstantial lawsuits" against high government officials to proceed to trial because they "undermine the effectiveness of government...." *Harlow,* 457 U.S. at 819 n. 35, 102 S.Ct. at 2739. In light of such considerations, the Federal Defendants' qualified immunity defense stands, and the Court dismisses the claims against the Federal Defendants in their individual capacities.

*E. Request to Amend the Amended Complaint*

**\*10** In Crosby's September 9, 2004 reply to Federal Defendants' motion to dismiss, Crosby requests leave to amend his Amended Complaint to include retaliatory conduct. The Court denies Crosby's request as deficient. Request to amend a complaint should be made through a proper motion and not within a reply brief.

*F. Motion and Demand for Jury Trial by Crosby*

Crosby also filed a "Motion and Demand for Jury Trial" on September 2, 2004, requesting the following: (1) a schedule to proceed to trial by jury pursuant to Fed.R.Civ.P. 38(b); (2) issuance of a discovery plan pursuant to Fed.R.Civ.P. 26.1; (3) issuance of a scheduling order pursuant to Fed.R.Civ.P. 16; (4) default judgment against all defendants; (5) a temporary injunction voiding the Federal Defendants' contract with HCCC to house immigration detainees; and (6) summary judgment pursuant to Fed.R.Civ.P. 56.1.

The Court denies Crosby's "Motion and Demand for Jury Trial." Crosby's request for issuance of a trial date, discovery plan, and scheduling order are premature. Magistrate Judge Madeline Cox Arleo will issue the proper scheduling orders in due time. Furthermore, there is no basis for default judgment against any defendants. All defendants have answered Crosby's Amended Complaint with dispositive motions. Crosby's request for a temporary injunction is likewise denied. Crosby has not provided sufficient information to weigh the immediate necessity of a temporary injunction. Crosby's request for summary judgment is also premature. Because discovery has not occurred yet and the Court has denied Warden Green's motion to dismiss for Crosby's claims of exposure to second-hand smoke and cold temperature, the request for summary judgment is denied.

### III. CONCLUSION

For the reasons stated above, Federal Defendants' motion to dismiss is granted. Hudson County's motion to dismiss is granted. In his official capacity, Warden Green's motion to dismiss is granted. In his individual capacity, Warden Green's motion to dismiss on Crosby's claims of gang activity, poor air ventilation, unsanitary food trays, spoiled food, and high cost telephone calls is granted. In his individual capacity, Warden Green's motion to dismiss on Crosby's claims of second-hand smoke exposure and cold temperature is denied.

The Court denies the various relief requested in Crosby's "Motion and Demand for Jury Trial."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10

Not Reported in F.Supp.2d, 2005 WL 1514209 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**


An appropriate order follows.

D.N.J.,2005.
Crosby v. Georgakopoulos
Not Reported in F.Supp.2d, 2005 WL 1514209
(D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.